**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

SHAKLEE CORPORATION and ROGER BARNETT, an individual,

Plaintiffs,

v.

PLEXUS WORLDWIDE, LLC,

Defendant.

Case No.:

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs Shaklee Corporation ("Shaklee") and Roger Barnett ("Mr. Barnett"), by and through their undersigned counsel, bring this Complaint against Defendant Plexus Worldwide, LLC ("Plexus") and allege as follows:

## NATURE OF THE CASE

1. Plexus's business has struggled in recent years. It has experienced declining sales, layoffs at its corporate office, and a host of other problems. As a direct selling company, Plexus engages with independent contractors, called "ambassadors," who sell Plexus products and earn sales commissions. But Plexus's business, and its ambassadors' sales commissions, have seen steep declines—with one Plexus executive acknowledging that recent commissions were "crappy." Plexus sales ambassadors are wisely seeking better opportunities elsewhere. In desperation, Plexus has shifted to a campaign of fear and intimidation against its own ambassadors, threatening to retaliate against any who dare leave for a more rewarding future. Plexus threatens to sue them, purporting to enforce overbearing and anti-competitive contractual terms—even though Plexus knows those terms are unenforceable and its litigation claims lack merit. Plexus hopes that by instilling this fear in its ambassadors, it will lock them in and slow the pace of its

downward spiraling business.

2. As a further sign of desperation, Plexus has also now engaged in a smear campaign against its successful competitors, like Shaklee. By spreading lies and false information about Shaklee and its business practices in the broader marketplace, Plexus hopes to deter the exodus of customers and sales agents from its organization. Using a fear and smear campaign, Plexus is trying to obtain what it cannot achieve by fair competition. This is unlawful and must be stopped. Unlike Plexus, Shaklee is a champion of free competition and wants the best for ambassadors throughout the industry. Shaklee therefore brings this suit to protect fair competition in the industry, the rights of independent sales contractors to work where they please, and to put an end to the lies that Plexus has spread about Shaklee.

3. Plexus's latest campaign began after two of its top Brand Ambassadors, Thomas and Brooke Hemingway, left Plexus because they saw better opportunities at Shaklee. Unable to compete with Shaklee and unable to present a compelling case for its ambassadors to stay, Plexus resorted to intimidation by attempting to enforce illegal non-compete agreements against its own Brand Ambassadors. Plexus then went even further and launched a smear campaign against Shaklee and its CEO, Roger Barnett.

4. On July 28, 2026, Plexus's Chief Legal Officer sent a letter (the "Letter") to the World Federation of Direct Selling Associations ("WFDSA")—copying over a dozen United States and international executives within the industry—falsely accusing Mr. Barnett of "actively facilitating" Plexus Brand Ambassadors' breach of their agreements.

5. Around the same time, Plexus senior management held a call with a large group of Plexus senior Brand Ambassadors (a recording of which has since been published by Plexus) repeating similar lies and informing them that Plexus had filed litigation against the departing

ambassadors. They did this *even though they knew their case was unlikely to succeed*. This was all part of Plexus's strategy to deter its field of ambassadors from leaving by threatening them with expensive litigation (even if the claims were meritless) and by dragging their names through the mud.

6. At the heart of Plexus's latest attack is an online open house that the Hemingways hosted on July 27, 2026 after leaving Plexus. The Hemingways publicized the event on social media to contacts and followers of their own who they had established during their careers, including countless people who they met long before they had anything to do with Plexus and through sources that have nothing to do with Plexus. Mr. Barnett appeared as a featured speaker during the open house. He did not assemble the invitation list, send the invitations, or select who attended. He spoke exclusively about Shaklee, with not a word about Plexus. And, before he spoke at all, Ms. Hemingway provided the audience with a written disclaimer displayed on screen, which stated: "This event is not intended for Plexus ambassadors. If you attend, watch, or participate, you are acknowledging that you were given this message and you chose to continue to attend the meeting . . . I'll take a moment so that you can remove yourself from the meeting at this time." Ms. Hemingway then also read the full text of what was on the screen out loud. She said aloud: "This event is not intended for Plexus ambassadors. If you attend, watch, or participate, you are acknowledging that you were given this message and you chose to continue to attend the meeting . . . I'll take a moment so that you can remove yourself from the meeting at this time." Ms. Hemingway then paused the broadcast so that anyone from Plexus could leave the presentation. In short, rather than solicit Plexus ambassadors, Ms. Hemingway went out of her way to explicitly state that the event was not intended for Plexus ambassadors and that they *should not* attend. She made this very clear. Only after that did Mr. Barnett speak.

7. Plexus's business is in decline. So are its ambassadors' earnings. An exodus of its ambassadors further reinforces this downward spiral. Rather than try to compete on the strength of its products or business, Plexus lashed out against Shaklee and the Hemingways. The Letter to the WFDSA was sent purporting to be an internal trade association grievance even though Plexus is not a member of the WFDSA. Plexus sent its letter to the WFDSA leadership intending to cause maximum reputational harm to Shaklee and its CEO. Plexus did not follow the WFDSA procedure for asserting internal trade association complaints. Plexus simply used this as a pretext to broadcast unfounded accusations to over a dozen industry leaders. Plexus took actions that WFDSA's procedures do not even contemplate. There was never any legitimate reason to involve the WFDSA, given that it is an international trade organization and this was at best a dispute between U.S.-based companies. Plexus sent the letter to this international trade association because Shaklee's CEO is the chairman and Plexus wanted to inflict maximum harm to his business and his reputation.

8. Plexus did not stop at the Letter. Plexus executives told others on at least one call to (at least) dozens of Plexus ambassadors that Plexus executives were "very close" to the head of the United States Direct Selling Association ("DSA"), and that they were planning to meet with him to attempt to inflict further damage on Shaklee and Mr. Barnett. Plexus made clear that it was taking legal action against the Hemingways because Plexus "need[ed] to show" what would happen if someone left Plexus, even though Plexus acknowledged that its claims had a low chance of success. What Plexus wanted to "show" its ambassadors was that if they were considering working somewhere else, or if any other company might give them a place to work, they would be met with onerous (though meritless) litigation and character assassination.

9. When Shaklee and Mr. Barnett demanded a retraction on August 3, 2026, Plexus

refused. When asked to identify a single thing Mr. Barnett and Shaklee did wrong, Plexus could only muster that Ms. Hemingway's allegedly improper recruitment was "apparently done in coordination with Shaklee and/or Mr. Barnett." This was a tacit admission that Plexus made these false statements based on mere speculation without any factual support.

10. Shaklee is a storied company in the direct-selling industry. Its Chairman and CEO, Mr. Barnett, also serves as the chairman of the WFDSA. He is a highly respected leader and champion of the industry. Neither Shaklee nor Mr. Barnett can allow their reputations to be smeared by these false allegations. Nor should Plexus be permitted to harm independent sales agents by using scare tactics to improperly restrict free and fair competition in the industry. Shaklee and Mr. Barnett therefore bring this action to seek damages from Plexus for the reputational harm it has caused them and to put an end to Plexus's anticompetitive scare tactics as means of doing business.

**PARTIES**

11. Plaintiff Roger Barnett, the CEO and Chairman of Shaklee Corporation, is a citizen of Florida who permanently resides in Miami, Florida.

12. Shaklee Corporation is incorporated in Delaware and has its principal place of business in Miami, Florida. Shaklee is therefore a citizen of Delaware and Florida.

13. Defendant Plexus Worldwide, LLC's sole member is Plexus Holdco, LLP. Plexus Holdco, LLP is an Arizona limited liability partnership whose partners (Tarl Robinson, Chris Reid, and Alec Clark) are all citizens of Arizona.[1] Plexus Worldwide, LLC is therefore a citizen of Arizona.

[1] *See* Plexus Worldwide, LLC's Corporate Disclosure Statement in *Plexus Worldwide, LLC v. Hemingway, et al.*, Case No. 2:26-cv-05186-JAT, ECF No. 7 (D. Ariz. Aug. 3, 2026).

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction over the state law claims alleged herein under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000 exclusive of interest, costs and fees.

15. Plexus is subject to personal jurisdiction in the District of Columbia because Plexus caused tortious injury in this District by directing its Letter to the WFDSA, which was in turn sent to the United States DSA, both of which are based in this District. On information and belief, Plexus also regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in this District, including by working with large numbers of ambassadors in this District, hosting events in this District, advertising and selling products (including through its ambassadors) in this District, and acting as a member of the WFDSA in this District. *See* D.C. Code § 13-423(a)(3-4).

16. Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391 because Plexus published defamatory statements to a wide audience that includes persons who reside within the District of Columbia and caused substantial harm to Plaintiffs' professional reputations in the District of Columbia.

## FACTUAL ALLEGATIONS

### I. Shaklee and Mr. Barnett's Leadership in the Direct-Selling Industry

17. Shaklee's founder, Dr. Forrest C. Shaklee, created the first multivitamin in the United States in 1915 and helped pioneer the nutritional supplement industry. Since opening its doors in 1956, Shaklee Corporation has become a leading nutrition company in the United States.

18. Shaklee markets and sells its products (in part) via independent contractors known as "Ambassadors," of which Shaklee has hundreds of thousands worldwide. This is known as

"direct selling."

19. Mr. Barnett has built a respected career and reputation in the health and direct-selling industry. He serves as Shaklee's Chief Executive Officer and Chairman, as well as Chairman of the WFDSA—a position he has held for six years.

20. The WFDSA is an international organization based in Washington, D.C. that represents more than 60 national direct selling associations with a combined $180 billion in revenue and more than 100 million representatives. It seeks "to pursue the highest level of ethical conduct in the global marketplace," and it "fosters advocacy by partnering with government, consumer and academic leaders around the world, strengthens management of national Direct Selling Associations and promot[es] integration and alignment of direct selling companies." The DSA, also based in Washington, D.C., is the national trade association for the United States, while the WFDSA is international.

21. In his role as WFDSA Chairman, Mr. Barnett works alongside chief executives from industry peers.

**II. The Hemingways Leave Plexus for Shaklee and Hold an Open House**

22. Thomas and Brooke Hemingway are a Florida-based couple who have built a successful business as entrepreneurs and influential leaders in several different fields, including direct selling, personal coaching, and public speaking. Their business activities extend beyond Plexus and include marketing other consumer products to their constituents. They rely on this range of entrepreneurial business activity to support themselves and their six children.

23. Among their various business activities, the Hemingways were Brand Ambassadors for Plexus until July 1, 2026. But facing Plexus's ongoing layoffs, flagging sales, and other signs of significant financial and operational weakness, the Hemingways decided to look for a new

opportunity. They chose to join Shaklee.

24. On July 27, the Hemingways hosted a virtual open house to update their network of personal friends and followers about their next chapter in the health and wellness sector. Mr. Barnett was a featured speaker.

25. Neither Shaklee nor Mr. Barnett was involved in organizing or promoting the Hemingways' July 27 open house. Instead, the Hemingways made a general-solicitation social media post, broadcast to anyone who could view it. They also sent a general-solicitation email to their personal contacts, which included people connected to the Hemingways through a variety of endeavors—including those long predating their affiliation with Plexus. The invite list was not derived from a Plexus database, contact list, or any other source affiliated with Plexus.

26. Though some Plexus ambassadors may have incidentally seen this material, the Hemingways ***did not*** target or seek to solicit Plexus ambassadors for this open house. To the contrary, Ms. Hemingway put a written disclaimer on screen and read the same instruction out loud, before the open house began:

> **This event is not intended for Plexus ambassadors. If you attend, watch, or participate, you are acknowledging that you were given this message and you chose to continue to attend the meeting . . . I'll take a moment so that you can remove yourself from the meeting at this time.**

27. After that message was put on screen and read aloud, and after giving a chance for Plexus ambassadors to leave, Ms. Hemingway introduced Mr. Barnett who spoke ***about Shaklee***. He did not mention Plexus at all, explicitly or implicitly.

### III. Plexus Makes Defamatory Statements on a Call with Industry Peers

28. On July 17, 2026, Plexus hosted a Zoom call with Plexus executives and at least

dozens of Plexus ambassadors who attended live. The call lasted approximately 45 minutes.

29. Plexus recorded the call and continues to host a website with a link to the recording where anyone can access it. Plexus also published it by distributing it to a Plexus listserv. Anyone who received the recording could forward it to outside parties simply by entering any email address.

30. The call had two purposes: to defame Shaklee, Mr. Barnett, and the Hemingways; and to scare and intimidate any Plexus ambassadors with the threat that they would meet a similar fate if they ever left Plexus. In other words, Plexus sought to coerce independent sales agents to remain with Plexus rather than look for better opportunities elsewhere, something it could not accomplish through fair competition.

31. On the call, Plexus's Chief Global Development Officer, Stuart MacMillan, recognized that Plexus was a struggling business and that its ambassadors were feeling the brunt of Plexus's failures. He acknowledged that June was "a pretty crappy commission month" for Plexus ambassadors, confessed that the company had recent layoffs, and identified a host of other changes that Plexus needed to make to try to turn the company around. Because Plexus knew that these vague aspirations would not likely be enough to retain Plexus ambassadors, it further sought to instill fear in the ambassadors that Plexus would retaliate against them if they left—using the Hemingways as an example.

32. Mr. MacMillan explained that Plexus was suing the Hemingways and that it was doing so because it "need[ed] to show" ambassadors what happens when someone leaves Plexus. He said that Plexus knows its chances of success in pursuing legal action are "not awesome," but that Plexus wanted to burden the Hemingways with litigation so that everyone would know "you can't just leave and . . . try to take our folks." Mr. MacMillan did not offer any genuine reasons

someone might want to stay at Plexus; instead, he made threats about the consequences and retaliation that would follow if anyone tried to work elsewhere.

33. Using the Hemingways as an example, Mr. MacMillan drove home how traumatizing Plexus's retaliation campaign would be if anyone similarly left Plexus to explore new opportunities. As he discussed the Hemingways' departure and repeatedly said that Plexus "can't allow" Brooke Hemingway to leave, and that Plexus's "legal efforts" would negatively impact her earnings, Mr. MacMillan acknowledged the "anxiety" among Plexus ambassadors, which he saw as he was "watching [their] faces" on the video call. He was also using the power of suggestion to cause fear and anxiety in those who may not have already been exhibiting it.

34. Mr. MacMillan also made several defamatory statements about Mr. Barnett and Shaklee during this call. Mr. MacMillan bragged about his connections with the head of the United States DSA. He told everyone that he had a meeting later that day with the head of the DSA—based in Washington, D.C.—to discuss Mr. Barnett's behavior that Mr. MacMillan said was "contrary to being a member of the DSA," even though he knew that statement was false and he had no basis to assert it.

## IV. Plexus Sends the Defamatory Letter to Plaintiffs' Industry Peers

35. On July 28, Plexus sent the Letter to the WFDSA, via email, with the Letter's subject line "WFDSA Complaint Regarding Conduct of WFDSA CEO Council Chairman"; *i.e.*, Mr. Barnett. A copy of the Letter is attached hereto as **Exhibit A**.

36. In it, Plexus accused Mr. Barnett—and by association, Shaklee—of engaging in illegal misconduct, and made several defamatory statements in the Letter, including that Mr. Barnett was:

i. "direct[ly] involve[d] in the solicitation of Plexus Brand

Ambassadors;"

ii. "actively facilitating breaches of binding contractual obligations;"

iii. "participat[ing] in recruiting activities targeting Plexus Brand Ambassadors."

37. Each of those statements is false, as Plexus knows. Mr. Barnett solicited no Plexus Brand Ambassador. He facilitated no breach of any contract. Plexus demanded that he stop "targeting Plexus Brand Ambassadors" and asked him to "cease" certain conduct, creating the unmistakable implication that he had been engaging in it—even though he never had.

38. Although Plexus styled its Letter as a "WFDSA Complaint," that was merely a fig leaf. Plexus knew that there was no legitimate reason for it to send the defamatory Letter (much less to an international trade association with no nexus to the subject matter) but did so solely out of malice with an intent to harm Mr. Barnett and Shaklee.

39. First, the WFDSA's procedures do not contemplate this kind of "complaint." The WFDSA's Code of Ethics limits the Code Administrator's authority to "settl[ing] any unresolved complaints *of Consumers*"; Plexus is not a consumer.

40. Second, the WFDSA's published procedures require a complainant to raise the matter in writing with the company or person involved and to allow approximately thirty days for a response; then to bring the matter to the national DSA's Code Administrator; and to contact the WFDSA at info@wfdsa.org only if the matter remains unresolved.

41. Plexus did none of that—because it had no interest in lodging a legitimate complaint (and no basis to do so with an international trade association). Its sole motive was to smear Mr. Barnett and Shaklee. Plexus sent the Letter to a dozen senior-level industry leaders, including Mr. Barnett's peers. Then, at Plexus's request, one of those leaders forwarded the Letter to the entire Board of Directors of the United States DSA, further publishing Plexus's lies to even

more industry leaders.

42. The Letter was part of Plexus's strategy to smear the reputations of Shaklee and Mr. Barnett, and to send a message to independent contractor ambassadors that competing with Plexus—or even deciding to leave Plexus—would be met with defamation and meritless lawsuits.

**V. Plaintiffs Receive Confirmation of Plexus's Bad Faith**

43. On August 3, 2026, Mr. Barnett and Shaklee demanded in writing that Plexus retract its Letter, issue a correction, and apologize.

44. Plexus refused and instead doubled down, stating that it "stands behind the statements in its WFDSA correspondence." But in its three-page response, and in the face of express evidence that its statements in the Letter were false, all Plexus could muster by way of evidence in support of its Letter was rank speculation:

> This perfunctory disclaimer, which was made after the invitations were sent and accepted and the presentation materials were made (***and apparently done in coordination with Shaklee and/or Mr. Barnett***), does not alter the legal analysis, and it does not negate the substance of what followed—a calculated effort to recruit current Plexus Brand Ambassadors in violation of binding contractual obligations.

(emphasis added).

45. Plexus has admitted to its ambassadors that its litigation against the Hemingways lacks merit. And it has admitted to Shaklee and Mr. Barnett that its defamatory statements about them were based on nothing but speculation.

46. Plexus has refused to retract the Letter, refused to correct it, refused to stop repeating its accusations, and refused to stop its campaign of unfair competition through smear and fear campaigns. Plexus has left Plaintiffs with no choice but to put a stop to these practices in

the industry and hold Plexus accountable for the harm it has caused.

## CAUSES OF ACTION

### COUNT I
### Unfair Competition
### (Shaklee only)

47. Plaintiffs repeat and reallege the allegations contained in paragraphs ¶¶ 1-46 as if fully set forth here.

48. Plexus currently competes in the direct selling industry with Shaklee, including competing to retain ambassadors.

49. Plexus also intends to compete with Shaklee in the future in the direct selling industry.

50. Plexus is unfairly competing with Shaklee by resorting to a campaign of fear and intimidation of Shaklee's Brand Ambassadors, including the Hemingways, by attempting to enforce illegal restrictive covenants, and by broadcasting that litigation across its network of independent sales agents as a warning signal to them, even though Plexus knows those claims are not well founded.

51. Plexus is further unfairly competing by engaging in a defamatory campaign to harm Shaklee by disseminating false statements that Shaklee was actively soliciting its ambassadors and facilitating contractual breaches, even though it knew these assertions were unfounded.

52. Plexus's pattern of activities set forth in this Complaint constitutes tortious unfair competition under the common law of the District of Columbia, and is causing financial harm to Shaklee by unfairly diminishing the fair competition for Ambassadors who are necessary for Shaklee's business.

**COUNT II**
**Defamation *Per Se***
**(Both Plaintiffs)**

53. Plaintiffs repeat and reallege the allegations contained in paragraphs ¶¶ 1-46 as if fully set forth here.

54. Mr. Barnett is not a public figure or a limited public figure.

55. Shaklee is not a public figure or a limited public figure.

56. Plexus published false and misleading statements with actual malice intending to damage Mr. Barnett's and Shaklee's reputation and business, or at the very least, Plexus published these statements with negligence.

57. Plexus published multiple malicious and defamatory statements disparaging Mr. Barnett's and Shaklee's business integrity and accusing Mr. Barnett of facilitating contractual breaches and questioning his professional ethics.

58. Plexus's statements about Mr. Barnett and Shaklee are false, including but not limited to Plexus's statements that:

a. Mr. Barnett was "direct[ly] involve[d] in the solicitation of Plexus Brand Ambassadors";

b. Mr. Barnett was "actively facilitating breaches of binding contractual obligations"; and

c. Mr. Barnett was "participat[ing] in recruiting activities targeting Plexus Brand Ambassadors."

59. Plexus's false and defamatory statements exposed Mr. Barnett and Shaklee to contempt and injury to their business reputation.

60. Plexus's false statements are defamatory *per se* because these statements adversely affect Mr. Barnett's and Shaklee's fitness for trade, business, and/or profession by disparaging their business integrity and accusing Mr. Barnett of facilitating contractual breaches and

questioning his professional ethics. Plaintiffs' reputation is necessary for their business. It supports their ability to engage in partnerships with industry figures, to obtain financing for acquisitions or other strategic business initiatives, to obtain media coverage, and to recruit and retain ambassadors.

61. Plexus published these false and defamatory statements about Mr. Barnett and Shaklee to over one dozen senior executives in the direct selling industry through email on July 28, 2026, and to dozens of members of the public in a call, a recording of which is now publicly available on a Plexus-hosted website.

62. Plexus knew the false and defamatory statements about Mr. Barnett and Shaklee were false when made and/or acted with reckless disregard to the truth of the statements.

63. Plexus's false and defamatory statements do not enjoy any absolute or qualified privilege.

64. Plexus published these false and defamatory statements about Mr. Barnett and Shaklee willfully and with actual malice, specifically with the purpose, desire, and effect of causing injury to Mr. Barnett and Shaklee. This is evidenced by Mr. MacMillan stating that the chances of success in pursuing claims arising from this conduct were "not awesome" but that Plexus "need[ed] to show" its ambassadors what would happen if they left.

65. Plexus's false and defamatory statements have adversely affected Mr. Barnett's and Shaklee's business reputation.

66. As a direct and proximate result of Plexus's actions, Mr. Barnett and Shaklee suffered substantial damages, including reputational injury in an amount to be proven at trial.

67. Plexus has knowingly and intentionally engaged in conduct of a malicious, oppressive, or fraudulent nature and has knowingly made false statements of and concerning Mr.

Barnett and Shaklee, thereby entitling Mr. Barnett and Shaklee to an award of punitive damages.

**COUNT III**
**Defamation**
**(Both Plaintiffs)**

68. Plaintiffs repeat and reallege the allegations contained in paragraphs ¶¶ 1-46 as if fully set forth here.

69. Plaintiff Mr. Barnett is not a public figure or a limited public figure.

70. Shaklee is not a public figure or a limited public figure.

71. Plexus published false and misleading statements with actual malice intending to damage Mr. Barnett's and Shaklee's reputation and business, or at the very least, Plexus published these statements with negligence.

72. Plexus published multiple malicious and defamatory statements disparaging Mr. Barnett's and Shaklee's business integrity and accusing Mr. Barnett of facilitating contractual breaches and questioning his professional ethics.

73. Plexus's statements about Mr. Barnett and Shaklee are false, including but not limited to Plexus's statements listed in Paragraph 58.

74. Plexus's false and defamatory statements exposed Mr. Barnett and Shaklee to contempt and injury to their business reputation. While Mr. Barnett and Shaklee continue to assess the harm sustained as of the date of the filing of this complaint, at a minimum Mr. Barnett and Shaklee have been harmed, including suffering reputational harm in front of senior leaders in their industry. Plaintiffs' reputation is necessary for their business. It supports their ability to engage in partnerships with industry figures, to obtain financing for acquisitions or other strategic business initiatives, to obtain media coverage, and to recruit and retain ambassadors.

75. Plexus published these false and defamatory statements about Mr. Barnett and

Shaklee to over one dozen senior executives in the direct selling industry through email on July 28, 2026, and to dozens of members of the public in a call, a recording of which is now publicly available on a Plexus-hosted website.

76. Plexus knew the false and defamatory statements about Mr. Barnett and Shaklee were false when made and/or acted with reckless disregard to the truth of the statements.

77. Plexus's false and defamatory statements do not enjoy any absolute or qualified privilege.

78. Plexus published these false and defamatory statements about Mr. Barnett and Shaklee willfully and with actual malice, specifically with the purpose, desire, and effect of causing injury to Mr. Barnett and Shaklee. This is evidenced by Mr. MacMillan stating that the chances of success in pursuing claims arising from this conduct were "not awesome" but that Plexus "need[ed] to show" its ambassadors what would happen if they left.

79. Plexus's false and defamatory statements have adversely affected Mr. Barnett's and Shaklee's business reputation.

80. As a direct and proximate result of Plexus's actions, Mr. Barnett and Shaklee suffered substantial damages, including reputational injury in an amount to be proven at trial.

81. Plexus has knowingly and intentionally engaged in conduct of a malicious, oppressive, or fraudulent nature and has knowingly made false statements of and concerning Mr. Barnett and Shaklee, thereby entitling Mr. Barnett and Shaklee to an award of punitive damages.

**COUNT IV**
**Defamation by Implication**
**(Both Plaintiffs)**

82. Plaintiffs repeat and reallege the allegations contained in paragraphs ¶¶ 1-46 as if fully set forth here.

83. Plaintiff Mr. Barnett is not a public figure or a limited public figure.

84. Shaklee is not a public figure or a limited public figure.

85. Plexus published false and misleading statements with malice intending to damage Mr. Barnett's and Shaklee's reputation and business, or at the very least, Plexus published these statements with negligence.

86. Plexus intended and endorsed a defamatory implication about Mr. Barnett and Shaklee by concluding its letter stating that relationships among WFDSA and DSA members "depend upon mutual respect and responsible leadership," suggesting that Mr. Barnett and Shaklee do not embody those professional traits.

87. Plexus did so by juxtaposing and/or omitting facts with the intention of creating a defamatory implication.

88. Plexus further intended and endorsed a defamatory implication about Mr. Barnett and Shaklee using intentionally misleading statements, including but not limited to asking that "Mr. Barnett personally ceases all direct participation in recruiting activities targeting Plexus Brand Ambassadors while contractual obligations remain in effect, including those certain non-solicitation obligations."

89. Plexus's false and defamatory statements exposed Mr. Barnett and Shaklee to contempt and injury to their business reputation. While Mr. Barnett and Shaklee continue to assess the harm sustained as of the date of the filing of this complaint, at a minimum Mr. Barnett and Shaklee have been harmed, including suffering reputational harm in front of senior leaders in their industry. Plaintiffs' reputation is necessary for their business. It supports their ability to engage in partnerships with industry figures, to obtain financing for acquisitions or other strategic business initiatives, to obtain media coverage, and to recruit and retain ambassadors.

90. Plexus published these false and defamatory statements about Mr. Barnett and Shaklee to over one dozen senior executives in the direct selling industry through email on July 28, 2026, and to dozens of members of the public in a call, a recording of which is now publicly available on a Plexus-hosted website.

91. Plexus knew the false and defamatory implications about Mr. Barnett and Shaklee were false when made and/or acted with reckless disregard to the truth of the statements.

92. Plexus's false and defamatory statements do not enjoy any absolute or qualified privilege.

93. Plexus published these false and defamatory implications about Mr. Barnett and Shaklee willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Mr. Barnett and Shaklee. This is evidenced by Mr. MacMillan stating that the chances of success in pursuing claims arising from this conduct were "not awesome" but that Plexus "need[ed] to show" its ambassadors what would happen if they left.

94. Plexus's false and defamatory implications have adversely affected Mr. Barnett's and Shaklee's business reputation.

95. As a direct and proximate result of Plexus's actions, Mr. Barnett and Shaklee suffered substantial damages, including reputational injury in an amount to be proven at trial.

96. Plexus has knowingly and intentionally engaged in conduct of a malicious, oppressive, or fraudulent nature and has knowingly made false statements of and concerning Mr. Barnett and Shaklee, thereby entitling Mr. Barnett and Shaklee to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

a. A declaration that Defendant's July 28, 2026 Letter is defamatory;

b. An order enjoining Plexus from making any further defamatory statements

about Mr. Barnett and Shaklee;

c. An order enjoining Plexus from engaging in its unfair business practices as described herein, including its defamatory campaign against Mr. Barnett and Shaklee and its intimidation of Shaklee's Brand Ambassadors;

d. An order declaring as unenforceable Plexus's illegal and unreasonable restrictive covenants that it purports to impose upon its ambassadors;

e. Compensatory damages in an amount to be proven at trial, including but not limited to for redress of reputational harms;

f. An award of punitive damages;

g. Attorneys' fees and costs;

h. Pre- and post-judgment interest, to the maximum extent provided by law; and

i. Any and all other legal or equitable relief to which Plaintiffs are entitled.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of any issues so triable.

Dated: September 10, 2026

Respectfully submitted,



**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Sarah Heaton Concannon (D.C. Bar No. 1780045)
555 13th Street NW, Suite 600
Washington, DC 20004
Tel.: (202) 538-8000
sarahconcannon@quinnemanuel.com

R. Brian Timmons (D.C. Bar No. 1032107)
(D.D.C. application forthcoming)
Ryan Landes (*pro hac vice* forthcoming)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Tel.: (213) 443-3000
briantimmons@quinnemanuel.com
ryanlandes@quinnemanuel.com

*Counsel for Plaintiffs*